**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE ABILITY INC.
SECURITIES LITIGATION

Case No. 16-cv-03893 (VM)

**JURY TRIAL DEMANDED**

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

2179127.11

Lead Plaintiffs Ametren L.P. and Theodore Zwicker ("Lead Plaintiffs") allege the following based upon the investigation conducted by their counsel, which included a review of, among other things: United States Securities and Exchange Commission ("SEC") filings by Ability Inc. and its affiliates; securities analyst reports and advisories about Ability Inc. and its affiliates; press releases and other public statements issued by Ability Inc. and its affiliates; court records, including the pleadings filed in *Brian Levy v. Benjamin Gordon, et al*., Case No. 2015CA003339 (Fla. 15th Cir. Ct. 2015); media reports about Ability Inc.; interviews with analysts; interviews with former associates; and consultations with experts.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of individuals who purchased Ability Inc. ("Ability" or the "Company") common stock and who seek remedies (1) under the Securities Act of 1933 ("Securities Act"), on behalf of all those who purchased or otherwise acquired Ability common stock issued pursuant or traceable to the November 25, 2015 Registration Statement[1] ("Registration Statement"), and were damaged thereby; and (2) under the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of all those who purchased or otherwise acquired Ability common stock between September 8, 2015 and May 2, 2016, inclusive, and were damaged thereby (the "Class").  The "Class Period" is September 8, 2015 through May 2, 2016, both dates inclusive.

2.      Ability is an Israel-based company that purports to provide cutting-edge "lawful interception" products such as surveillance, decryption, cybersecurity, and geolocation solutions

---

[1] The Registration Statement was first filed with the SEC on Form S-4 on September 17, 2015 and subsequently amended three times.  Amendment No. 3, filed with the SEC on Form S-4 on November 25, 2015, was declared effective by the SEC on December 2, 2015.  The original Form S-4 and its amendments are collectively referred to herein as the Registration Statement.

1

to government agencies, military forces, and law enforcement.  Ability advertises its focus on undetectable technologies, including off-air interception and decryption of communications.

3.       Although founded in 1994, Ability in its current iteration is the product of a business combination ("Business Combination") between Cambridge Capital Acquisition Corporation ("Cambridge"), its subsidiary Cambridge Holdco Corp. ("Holdco"), and Ability Computer & Software Industries, Ltd. ("Ability, Ltd.").  The Business Combination involved Cambridge merging into Holdco, with Holdco surviving as the publicly-traded entity; the Ability, Ltd. shareholders then exchanged all of their shares in Ability, Ltd. for shares of Holdco and cash; Holdco was then re-named as Ability.

4.       Benjamin Gordon ("Gordon") was the chief executive officer ("CEO") of Cambridge, served as the interim CEO of Holdco, and served on the Ability board of directors during the Class Period alleged herein.  Anatoly Hurgin ("Hurgin") was the co-founder and CEO of Ability, Ltd. and currently serves as the CEO of Ability and the Chairman of its Board of Directors.  Avi Levin ("Levin") serves as the chief financial officer ("CFO") of Ability.  BDO Ziv Haft was Ability, Ltd.'s independent registered public accounting firm, and subsequently became Holdco's independent registered public accounting firm.  Defendants in this action include Ability, Hurgin, Gordon, Levin, and BDO Ziv Haft.

5.       In the run-up to securing approval of the Business Combination, and in the aftermath of its approval, Defendants made statements – during investor presentations, in the Registration Statement, and in the December 2, 2015 proxy statement and prospectus ("Proxy Statement") for the Business Combination, among other places – that were untrue and/or omitted facts that needed to be stated to render certain statements not misleading.  The statements were material because, among other things, they pertained to core financial information about Ability

that informed the investing community's view of Ability and its prospects for success, and because they presented a particular picture of Ability's risk profile.

6.     Those statements fell into several categories: *first*, Defendants presented key financial metrics about Ability that were false or misleading when they were made; *second*, Defendants made statements about Ability's internal controls that omitted material facts, *i.e.*, that Ability's internal controls over financial reporting suffered from multiple material weaknesses that rendered the Company's financial statements unreliable and misleading; *third*, Defendants represented that their financial statements presented fairly, in all material respects, the financial position of the Company in conformity with U.S. generally accepted accounting principles, or "GAAP," a statement that was untrue and misleading when it was made; and *fourth*, Defendants represented that Ability had developed a new and proprietary transformational technology called "ULIN" that was unique to Ability and developed in-house, a statement that was untrue and misleading when it was made.

7.     On May 2, 2016, less than six months after the Registration Statement and Proxy Statement were disseminated – and only after the Business Combination was approved – Defendants disclosed the truth: Ability had to restate its consolidated financial statements "as of December 31, 2014, and for the two years in the period then ended, and as of June 30 and September 30 in 2015 and 2014, and for the six and nine month periods then ended."  In making this announcement, Defendants made several key corrective disclosures:

     a.     *First*, Defendants disclosed that Ability suffered from "material weaknesses" in its internal controls over financial reporting, affecting the Company's accounting over a period of years.

b.      *Second*, Ability restated its consolidated financial statements for 2014 and 2013 "to reflect correction of errors with respect to previously unrecognized commissions due to a vendor on revenues that were recognized in 2014, 2013 and 2012; improper allocation and timing of revenue recognition from connection to supportive infrastructure in multiple element sale transactions recognized in 2014, 2013 and 2012; and previously unrecognized commissions due to a third party on cost of revenues that were recognized in 2014." This restatement resulted in material adjustments to Ability's financials, including, for example: net and comprehensive income for year-end 2014 decreased by 14%; and net and comprehensive loss for year-end 2013 (there was no profit in 2013) increased by 4%.

c.      *Third*, Defendants disclosed that Ability had committed a possible violation of the enhanced conflict of interest provision in Section 402 of the Sarbanes-Oxley Act. Section 402 makes it unlawful for any issuer to extend or maintain credit in the form of a personal loan to any director or executive officer of that issuer.

d.      *Fourth*, Defendants disclosed that Ability's purportedly transformational ULIN technology was not developed or owned by Ability, but rather was developed and owned by an unrelated third party that had strict and total control over the product, and that Ability's "sales are based on a reseller agreement granting [Ability] a worldwide exclusive right to sell ULIN, which automatically terminates in October 2018 and may be terminated by either party under certain specific circumstances." Indeed, Defendants disclosed that Ability owed the unrelated third party a penalty if it failed to meet minimum annual sales of $10,000,000 per year.

8.      These disclosures rocked Ability and its investors. Once the truth was revealed, the price of Ability's common stock declined from its previous closing price of $7.32 per share

on April 29, 2016 to close at $4.90 per share on May 2, 2016, a drop of $2.42 per share, or approximately 33%, on heavy trading volume.

9.      Also on May 2, 2016, Ability disclosed that it had authorized an internal investigation to be overseen by its audit committee into the facts and circumstances giving rise to the May 2016 restatement.  On February 15, 2017, the Company announced that the SEC had opened an investigation into Ability's transaction with Cambridge and the May 2016 accounting restatement.  Benjamin Gordon, Mitchell Gordon, and Derek Zissman – all members of Ability's Board of Directors and, specifically, members of the audit committee – resigned, leaving the Company in December 2016.  Their replacements – Amos Malka, Amnon Dick, and Shalom Singer – then joined the Ability Board of Directors, but abruptly resigned only a few months later, on April 9, 2017, along with two more directors, Meir Moshe and Efraim Halevy.

10.      On May 16, 2017, the Company announced that its auditor has substantial doubt about its ability to continue as a going concern.  Finally, on June 8, 2017, the Company announced that it received notification a few days prior, on June 6, that it was not in compliance with the minimum bid price requirement set forth in NASDAQ's rules, and thus could be delisted.

11.      Lead Plaintiffs now bring these claims under the Securities Act and the Exchange Act on behalf of Class Members damaged by Defendants' conduct.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a).   The claims asserted arise under the following provisions of the federal securities laws: Section 11 of the Securities Act, 15 U.S.C. § 77k; Section 15 of the Securities

Act, 15 U.S.C. § 77o; Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Section 20(a) of

the Exchange Act, 15 U.S.C. § 78t(a); and Rule 10b-5, 15 C.F.R. § 240.10b-5.

13.     Venue is proper in this District pursuant to the Securities Act under 15 U.S.C.

§ 77v(a), and pursuant to the Exchange Act under 15 U.S.C. § 78aa(a), because Defendants

transact business in this District.  During the Class Period, the Company's shares were traded

over the NASDAQ Stock Market, an electronic securities exchange located in this District.

### PARTIES

14.     Lead Plaintiff **Ametren L.P.** ("Ametren") is an institutional investor in Ability.

As indicated in its previously filed certification, Ametren purchased shares of Ability common

stock issued pursuant and/or traceable to the Registration Statement, and purchased shares of

Ability common stock during the Class Period, and suffered damages as a result of Defendants'

violations of the federal securities laws.

15.     Lead Plaintiff **Theodore Zwicker** is an investor in Ability.  As indicated in his

previously filed certification, Zwicker purchased shares of Ability common stock issued pursuant

and/or traceable to the Registration Statement, and purchased shares of Ability common stock

during the Class Period, and suffered damages as a result of Defendants' violations of the federal

securities laws.

16.     Defendant **Ability Inc.** ("Ability" or "Company") is a publicly-traded corporation

that sells advanced interception, monitoring, and cyber-intelligence tools and services to

government agencies.  Its products and services include voice conversation interception systems

for satellite and cellular networks, geo-location systems, cyber solutions, and a crime prevention

solution.  Ability was previously known as Holdco.  Ability's principal executive office is

located at Yad Harutzim 14, Tel Aviv, Israel 6770007.  Ability is traded on the NASDAQ under the ticker "ABIL."

17.     Defendant **Anatoly Hurgin** is the CEO and Chairman of the Board of Directors of Ability, and has served in that position since December 23, 2015, when the Business Combination between Cambridge and Ability, Ltd. closed.  Beginning in 1994, Hurgin served as the CEO of Ability, Ltd.  As a result of the Business Combination, Hurgin owns approximately 31.5% of the outstanding shares of Ability common stock.  Because of his central role in and intimate familiarity with Ability's business, Hurgin was responsible for and had ultimate authority over all of the statements regarding Ability made in SEC filings, including the Registration Statement and the December 2, 2015 Proxy Statement for the Business Combination.  He also made statements regarding Ability's business, operations, and/or financial performance and prospects during investor presentations.  Hurgin signed: (1) Ability's Form 8-K, filed with the SEC on December 30, 2015, which incorporated by reference all of the false and misleading statements made in the December 2, 2015 Proxy Statement, (2) a form appended to the Registration Statement in which he consented to the use of his name and to being named in the Registration Statement as a person about to become a director, and (3) Ability's Form 20-F, filed with the SEC on May 2, 2016.

18.     Defendant **Avi Levin** has been the CFO of Ability since November 2015.  Levin has a corporate finance and accounting background: he is a Certified Public Accountant in the United States and Israel; he previously worked at a major accounting firm, PricewaterhouseCoopers, in its technology industry practice; and he has a college degree in economics and accounting from Ben-Gurion University of the Negev in Israel, as well as an MBA from New York University's Stern School of Business.  He made statements promoting

7

Ability's business, operations, and/or financial performance and prospects during investor presentations. In addition, because of his central role in Ability, he was responsible for and had ultimate authority over the statements regarding Ability made in its SEC filings, including the December 2, 2015 Proxy Statement.

19.     Defendant **Benjamin Gordon** was a director of Ability and a member of its audit committee, serving in that position from the close of the Business Combination until December 2016.  He served as the CEO of Cambridge, and served as the interim CEO of Holdco prior to completion of its combination with Ability, Ltd.  He has a bachelor of arts from Yale College and an MBA from Harvard Business School.  Gordon signed the Registration Statement, the December 2, 2015 Proxy Statement, and Ability's SEC filings from September 10, 2015 until December 2015.  He also made statements regarding Ability's business, operations, and/or financial performance and prospects during investor presentations.

20.     Defendant **BDO Ziv Haft** is a certified public accounting firm and member of the international BDO network of public accounting, tax, and advisory firms.  It audited Ability, Ltd.'s consolidated balance sheets and financial statements for the years ending on December 31, 2014 and December 31, 2013.  That audit report was included in the Registration Statement, and BDO Ziv Haft consented to both the use of the report in the Registration Statement and to its being referred to as an "expert" in the Registration Statement.

21.     Non-party **Cambridge Capital Acquisition Corporation** ("Cambridge") was incorporated in Delaware on October 1, 2013.  It was a publicly-traded blank check company formed to effect a business combination.  Cambridge merged into its wholly-owned subsidiary Cambridge Holdco Corp., which was renamed as Ability Inc.

22.     Non-party **Cambridge Holdco Corp.** ("Holdco") was a wholly-owned subsidiary of Cambridge and was renamed as Ability as a result of the Business Combination.   Holdco was incorporated in the Cayman Islands.

23.     Non-party **Ability Computer & Software Industries, Ltd.** ("Ability, Ltd.") is an Israel-based company that was founded in 1994 and owned by Anatoly Hurgin and Alexander Aurovsky, Hurgin's long-time business associate.   As a result of the Business Combination, Ability Inc. is the sole owner of Ability, Ltd.

**Confidential Witness**

24.     **Confidential Witness 1** ("CW1") was a manager at Ability, Ltd. between 2003 and May 2013.   CW1's responsibilities included customer service and management, office management, inventory management, and some account management with domestic (Israeli) customers.   According to CW1, Ability, Ltd. was a very small operation, comprising 8 to 9 employees during CW1's tenure.   Ability, Ltd. was essentially entirely run by Hurgin: he managed the business by himself, with limited help from his co-founder, Aurovksy; Hurgin handled all business with Ability, Ltd.'s foreign customers personally, and no one else monitored those customer relationships; Hurgin alone negotiated all of Ability, Ltd.'s contracts with its customers; all new orders or meetings with prospective clients were dealt with by Hurgin, and he was involved in each and every new deal.   CW1 was also in charge of overseeing the accounting, although CW1's primary responsibility, to that effect, was to generate reports using an Israeli accounting software that Ability, Ltd. never trained CW1 to use.   CW1 had no formal accounting or finance training.   Ability, Ltd. outsourced its accounting function to a small Israeli accounting firm, and Hurgin dealt with that firm directly.   CW1 stated that Ability, Ltd. did not have a chief financial officer or management meetings during CW1's tenure.

## CLASS ACTION ALLEGATIONS

25.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased Ability common stock and who seek remedies (1) under the Securities Act, on behalf of all those who purchased or otherwise acquired Ability common stock issued pursuant or traceable to the November 25, 2015 Registration Statement, and were damaged thereby; and (2) under the Exchange Act, on behalf of all those who purchased or otherwise acquired Ability common stock between September 8, 2015 and May 2, 2016, inclusive, and were damaged thereby.  Excluded from the Class are Defendants and their families; the officers and directors of Ability, Cambridge, and Holdco, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

26.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ability common stock and the common stock of its predecessor was actively traded on the NASDAQ.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ability or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

28.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether the Registration Statement contained untrue statements of material fact or omitted material facts required to be stated therein or necessary to make the statements therein not misleading;

c.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Ability;

d.      whether the price of Ability common stock was artificially inflated during the Class Period; and

e.      to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT ALLEGATIONS

**A.      Hurgin, Gordon, and Levin rush to consummate the Business Combination between Cambridge and Ability, Ltd.**

31.      Defendant Ability is the product of the Business Combination between Cambridge, its subsidiary Holdco, and Ability, Ltd that closed on December 23, 2015.

32.      Cambridge was a "blank check company" incorporated in Delaware in October 2013 and formed for only one purpose: to combine with another business.  Cambridge's stated focus was a target in the supply chain industry, with a particular focus on transportation and logistics businesses.

33.      But Cambridge had a ticking clock for a deal: its failure to complete a business combination by June 23, 2015 – or by December 23, 2015, assuming a definitive agreement for a deal was in place by June 23 – would result in its liquidation, *i.e.*, redemption of 100% of the outstanding public shares at a per-share price, payable in cash to its shareholders.

34.      By May 2015, Cambridge was desperate: it met with a distribution company in March 2014 about a potential combination, but the deal fell apart in July 2014.  It then considered combining with another target, Parakou Tankers, Inc., and entered into a merger agreement, but that deal also fell apart in May 2015.

35.      Cambridge then turned to Ability, Ltd., a company far outside of Cambridge's focus and expertise.  Cambridge had told its investors it was focused on the supply chain industry, but Ability, Ltd. – a company in the interception and decryption industries – was in a totally different business.

36.      This mismatch raised a red flag with the SEC: on October 14, 2015, during its review of the Business Combination, the SEC wrote a letter asking for an explanation of why

Cambridge decided to consider a combination with Ability, Ltd., given that it was so far outside of Cambridge's industry focus and expertise.

37.     Despite the mismatch, Cambridge took steps towards a combination and executed a non-disclosure agreement on June 3, 2015.  On September 6, 2015, Cambridge and Ability, Ltd. entered into the Business Combination agreement.

38.     The Business Combination involved five core steps:

a.      *First*, Cambridge merged with and into its wholly-owned subsidiary, Holdco, with Holdco surviving as a public company incorporated in the Cayman Islands;

b.      *Second*, the shareholders of Ability, Ltd. – Anatoly Hurgin and Alexander Aurovsky – subsequently exchanged 100% of their ordinary shares of Ability, Ltd. for over 17,000,000 ordinary shares of Holdco and $18,150,000 in cash, leaving Holdco as the sole owner of Ability, Ltd.;

c.      *Third*, Holdco was renamed "Ability Inc." and its shares would trade on the NASDAQ under the ticker "ABIL";

d.      *Fourth*, the Business Combination made the Ability, Ltd. shareholders, Hurgin and Aurovsky, eligible for millions of additional Ability shares, conditioned upon Ability reaching certain net income targets in 2015, 2016, 2017, and 2018; and

e.      *Fifth*, prior to the closing of the Business Combination, Ability, Ltd. would declare and pay a one-time dividend of $11,000,000 to its only two shareholders, Hurgin and Aurovsky.

39.     On November 25, 2015, Defendants filed with the SEC a third-amended Registration Statement under the Securities Act of 1933 on a Form S-4.  The SEC deemed that

2179127.11

Registration Statement effective on December 2, 2015.  The Registration Statement incorporated the Proxy Statement for the Business Combination.

40.     Cambridge's shareholders had to vote to approve the Business Combination.  On December 22, 2015, Cambridge held a special meeting during which its eligible shareholders voted to approve the Business Combination with Ability, Ltd.  On December 23, 2015, the transactions constituting the Business Combination closed, and approximately 25,700,000 shares of Ability (renamed from Holdco) common stock began trading on the NASDAQ, under the ticker "ABIL," all issued pursuant to the Registration Statement.

41.     As was later revealed, the Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make certain statements in it not misleading:

    a.     *First*, the Registration Statement presented key financial metrics about Ability that were untrue when made;

    b.     *Second*, the Registration Statement represented that Ability, Ltd.'s financial statements presented fairly, in all material respects, the financial position of the Company in conformity with U.S. generally accepted accounting principles, or "GAAP," a statement that was untrue when made, as explained more fully below; and

    c.     *Third*, the Registration Statement omitted that Ability's internal controls over financial reporting suffered from multiple material weaknesses, rendering the Company's financial statements misleading and unreliable.

**B.     Defendants violate GAAP's straightforward principles governing expense and revenue recognition.**

42.     SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or

inaccurate, despite footnote or other disclosures[.]"[2]   Violations of GAAP are therefore violations of SEC regulations.   The Registration Statement presented Ability, Ltd.'s financial statements as a fair and accurate picture of the Company's financial position, and specifically represented that Ability, Ltd.'s financial statements were prepared "in conformity with accounting principles generally accepted in the United States of America."[3]

43.     GAAP are principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured.[4]   GAAP are the official accounting standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and the Financial Accounting Standards Board ("FASB").   On July 1, 2009, the FASB enacted the Accounting Standards Codification ("ASC") as the single source of authoritative GAAP effective for interim and annual periods ending after September 15, 2009.   The FASB Concepts Statements provide the conceptual framework from which GAAP originates.

44.     Here, the accounting misstatements that necessitated Ability's restatement violated basic, longstanding, simple, and straightforward provisions of GAAP.   Ability violated two separate sets of accounting provisions: those governing recognition of expenses, and those governing recognition of revenue.

45.     Recognition of expenses is determined by the "matching principle."   Generally, expenses should be recorded in the period they are incurred.   When a transaction results in

---

[2] 17 C.F.R. § 210.4-01(a)(1).

[3] Cambridge Holdco Corp., Amendment No. 3 to Registration Statement Under the Securities Act of 1933 on Form S-4, November 25, 2015, at F-48 ("Registration Statement").

[4] AU § 411, The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles in the Independent Auditor's Report ("AU 411"), ¶ 2.

revenue *and* expenses, the revenue and expenses "are directly related to each other and require recognition at the same time," *i.e.*, they are "matched."[5]   The paradigmatic example of an expense that is directly related to revenue is a sales commission.[6]   Because a commission to a third party is paid when a transaction is completed, and because revenue is not generated from the transaction until the third party completes the transaction, a commission is an expense that is associated with the revenue generated by the transaction, and they must be matched and recognized together.

46.     Defendants violated these simple accounting rules governing expense recognition when they failed to recognize commissions due to a vendor on revenues that were recognized in 2012, 2013, and 2014, and when they failed to recognize commissions due to a third party on cost of revenues recognized in 2014.   Ability's conduct disregarded straightforward and textbook accounting rules, *i.e.*, the matching principle, and the effect of these errors was that for certain years Ability's expenses appeared to be less than they actually were, and correspondingly its revenue and net income appeared greater than they actually were.

47.     Recognition of revenue by an entity during a period involves consideration of two factors under GAAP.   First, revenue is generally not recognized until "realized" or "realizable." Revenue is "realized" when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash, and that revenue is "realizable" when related assets received or held are readily convertible to known amounts of cash or claims to cash.   Second, revenue is not recognized until "earned."   An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing

---

[5] FASB Concepts Statement No. 6, Elements of Financial Statements – a replacement of FASB Concepts Statement No. 3 (incorporating an amendment of FASB Concepts Statement No. 2), December 1985, at ¶¶ 144-46.

[6] *Id.* ¶¶ 144-46.

major or central operations, and revenues are considered to have been "earned" when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. The two conditions – being realized, or realizable, and earned – are typically met when the product or merchandise is delivered or services rendered to a customer, and revenues from selling activities and gains and losses from sales of other assets are commonly recognized at the time of sale (usually meaning delivery).

48.     In SEC Staff Accounting Bulletin Topic 13: Revenue Recognition ("Topic 13") (a codification of Staff Accounting Bulletin No. 101, which was issued on December 3, 1999), the SEC incorporated the concepts set forth in FASB Concepts Statement No. 5 and stated that revenue should be recognized when *all* of the following criteria are met: (1) persuasive evidence of a final understanding between the parties exists as to the specific nature and terms of the agreed-upon transaction; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured. The SEC explained in Topic 13 that if an arrangement is subject to subsequent approval – *e.g.*, by a management committee or board of directors – or execution of another agreement, revenue recognition is inappropriate until that subsequent approval or agreement is complete.

49.     The Registration Statement represented that Ability abided by these principles: it stated that "when a sale arrangement contains multiple elements, Ability allocates revenue to each element based on estimated selling price," that "[r]evenues from sales of products are recognized when Ability has delivered products to the customer[,] retained final acceptance, the revenue can be reliably measured and collectability of the receivables is reasonably assured," and that "[r]evenues from projects are recognized using the completed contract method to determine

17

the appropriate amount in a given period," under which "costs are accumulated on the balance sheet until the contract is complete or substantially complete."[7]

50.      In reality, however, Ability violated the simple GAAP rules governing revenue recognition, and misstated that it was abiding by its own internal accounting rules, when it improperly recognized revenue for 2014, 2013, and 2012.  Ability's admission that it had to restate its financials – because they were materially untrue – for 2014 and 2013 to reflect a correction of errors with respect to improper allocation and timing of revenue recognition in multiple element sale transactions demonstrates that it did not abide by GAAP or by its own internal accounting rules, and that it misrepresented that it was abiding by certain revenue recognition principles.  The effect of these errors was to render Ability's financial statements untrue and unreliable.

**C.      The Registration Statement's untrue and misleading statements.**

51.      On **November 25, 2015**, the Registration Statement was filed.  It presented the following financial information for 2013 and 2014:[8]

**Results of Operations**

The following table sets forth a summary of our operating results:

| (U.S.$; $ in thousands) | Nine Months Ended September 30, | | Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2014 | 2013 |
| Revenues | $51,689 | $20,680 | $22,134 | $5,588 |
| Cost of revenues | 27,609 | 12,797 | 14,654 | 4,455 |
| Gross profit | 24,080 | 7,883 | 7,480 | 1,133 |
| Sales and marketing expenses | 2,420 | 2,323 | 2,387 | 665 |
| General administrative expenses | 1,058 | 302 | 469 | 419 |
| Operating income | 20,602 | 5,258 | 4,624 | 49 |
| Finance expenses (income), net | 42 | (75) | (269) | 371 |
| Income (loss) before income taxes | 20,560 | 5,333 | 4,893 | (322) |
| Income taxes expenses (benefit) | 3,277 | 1,357 | 1,260 | (53) |
| Net and comprehensive income (loss) | $17,283 | $ 3,976 | $ 3,633 | $ (269) |

---

[7] Registration Statement, at 150.

[8] Registration Statement, at 151.

52.    These same financials were repeated in the audit report that was included in the Registration Statement.[9]

53.    The Registration Statement also provided net and comprehensive income and loss metrics in the audit report that was included in the Registration Statement:[10]

**Ability Computer & Software Industries Ltd.**

**Consolidated Statements of Changes in Shareholders' Equity (Deficit)**

| | Ordinary Shares | Retained earnings (accumulated losses) | Total |
|---|---|---|---|
| | | (U.S. dollar in thousands) | |
| Balance as of December 31, 2012 | 35 | (921) | (886) |
| Net and comprehensive loss | | (269) | (269) |
| Balance as of December 31, 2013 | 35 | (1,190) | (1,155) |
| Net and comprehensive income | | 3,633 | 3,633 |
| Balance as of December 31, 2014 | 35 | 2,443 | 2,478 |

54.    The Registration Statement stated that these financial statements were "prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and include all adjustments necessary for the fair presentation of the Group's [Ability, Ltd. and consolidated company's] financial position, results of operations, changes in shareholders' equity (deficit) and cash flows for the periods presented."[11]

55.    The Registration Statement included a letter from BDO Ziv Haft, Ability, Ltd.'s independent auditor, stating that "[i]n our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Group as of December 31, 2014 and 2013 and its results of operations and cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."[12]

---

[9] Registration Statement, at F-51.

[10] Registration Statement, at F-52.

[11] Registration Statement, at F-56.

[12] Registration Statement, at F-48.

56.     The Registration Statement stated that Ability abided by revenue recognition policies, *i.e.*, that "when a sale arrangement contains multiple elements, Ability allocates revenue to each element based on estimated selling price," that "[r]evenues from sales of products are recognized when Ability has delivered products to the customer[,] retained final acceptance, the revenue can be reliably measured and collectability of the receivables is reasonably assured," and that "[r]evenues from projects are recognized using the completed contract method to determine the appropriate amount in a given period," under which "costs are accumulated on the balance sheet until the contract is complete or substantially complete."[13]

57.     These statements were untrue and/or misleading because they omitted material facts necessary to render them not misleading.  As Defendants later admitted, the Company's consolidated financial statements as of December 31, 2014 and for the two years in the period then ended were misstated.  The financial statements were not prepared in accordance with GAAP or Ability's publicly disclosed revenue recognition policy, *see supra* ¶¶ 42-50.  The financial statements were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that was omitted but that needed to be disclosed to render the statements not misleading to a reasonable person reading the statements fairly and in context.

58.     Moreover, the Registration Statement's discussion of Ability's internal controls over financial reporting was untrue and/or misleading because it omitted facts that needed to be disclosed to render it not misleading.  While the Registration Statement stated that Ability's internal controls "do not currently meet all of the standards contemplated by Section 404 of the Sarbanes-Oxley Act," and that "a material weakness was noted in our financial reporting closing

---

[13] Registration Statement, at 29, 30, 100, 149-53.

process with respect to cut-off procedures relating to expenses[,]" it simultaneously assured investors that Ability had already "made, and will continue to make, changes to our internal controls and procedures for financial reporting and accounting systems to meet our reporting obligations as a publicly traded company," that Ability was "in the process of addressing [its] internal controls over financial reporting," that Ability would "establish formal policies, processes and practices related to financial reporting," and that Ability would "identify key financial reporting risks" and assess the "potential impact and linkage of those risks to specific areas and activities within" the Company." Despite the foregoing assurances, the Registration Statement opined vaguely that "the measures we take may not be sufficient to satisfy our obligations as a publicly traded company."[14]

59.     These statements omitted the following material facts necessary to render them not misleading: *first*, Ability did not have "a" material weakness, it had several; *second*, Ability's material weaknesses were not limited to expenses – rather, its material weaknesses had an impact on how it accounted for expenses *and* revenue, and were responsible for a possible violation of Section 402 of Sarbanes-Oxley, the enhanced conflict of interest provisions; *third*, Ability's material weaknesses in internal controls over financial reporting were not a hypothetical future risk, but rather were then-present, as demonstrated by the need for a restatement *less than six months* after the Registration Statement was filed; and *fourth*, Ability's material weaknesses were so severe that they necessitated a restatement of its financials for several years – Ability restated its consolidated financial statements for 2014 and 2013.

60.     These statements and omissions were material.   Ability had presented its financials as accurate and had failed to disclose material negative information about its internal

_____

[14] Registration Statement, at 54.

controls that, if disclosed, would have rendered the financials not misleading.  Like all publicly-traded companies, Ability was required under Section 13 of the Exchange Act (added by the Foreign Corrupt Practices Act of 1977) to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that, among other things, "transactions are recorded as necessary . . . to permit preparation of financial statements *in conformity with generally accepted accounting principles* or any other criteria applicable to such statements."[15] Against this backdrop, the Registration Statement's presentation of Ability's financials, its statements that Ability complied with GAAP, and its omission of facts regarding the extent of Ability's material weaknesses in its internal controls over financial reporting demonstrates that the Registration Statement's untrue and/or misleading statements materially altered Ability's risk profile to investors.

> ### D.      The truth emerges.

61.     On May 2, 2016, Ability issued a press release announcing its fourth quarter and year-end 2015 financial results, disclosing that it had restated its consolidated financial statements as of December 31, 2014 and December 31, 2013, and as of June 30 and September 30 in 2015 and 2014, and for the six and nine month periods then ended.[16]  Ability also filed its 2015 Form 20-F with the SEC the same day.  In both the press release and the 2015 Form 20-F, Ability made several key corrective disclosures:

a.      *First*, Ability disclosed that it had identified "material weaknesses" in its internal controls over financial reporting: "certain amounts due to two third parties had not been timely expensed, and revenue recognition in multiple element sale transactions had not been

---

[15] 15 U.S.C. § 78m(b)(7) (emphasis added).

[16] Ability Inc., Press Release: "Ability Inc. Reports Fourth Quarter and Full-Year 2015 Financial Results," May 2, 2016.

properly allocated and timely deferred," resulting "in a restatement of the consolidated financial statements as of December 31, 2014 and for the two years in the period then ended and as of June 30 and September 30 in 2015 and 2014 and for the six and nine month periods then ended, respectively."[17]   The material weaknesses meant that Ability's controls did "not ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified and that such information is accumulated and communicated to our management to allow for timely decisions regarding required disclosure."[18]   Ability declined to provide an assessment of its internal controls over financial reporting as of December 31, 2015.[19]

> b.    *Second*, Ability restated its consolidated financial statements for 2014 and 2013 "to reflect correction of errors with respect to previously unrecognized commissions due to a vendor on revenues that were recognized in 2014, 2013 and 2012; improper allocation and timing of revenue recognition from connection to supportive infrastructure in multiple element sale transactions recognized in 2014, 2013 and 2012; and previously unrecognized commissions due to a third party on cost of revenues that were recognized in 2014."[20]   This restatement resulted in material adjustments to Ability's financials, including, for example: net and comprehensive income for 2014 decreased by 14%; and net and comprehensive loss for year-end 2013 (there was no profit in 2013) increased by 4%.  Ability's restated financial statements read as follows:[21]

---

[17] Ability Inc. Annual Report for fiscal year ended December 31, 2015, filed with the SEC on May 2, 2016 on Form 20-F ("2015 Form 20-F"), at 27.

[18] 2015 Form 20-F, at 27.

[19] 2015 Form 20-F, at 27.

[20] 2015 Form 20-F, at 47.

[21] 2015 Form 20-F, at F-20-21.

Statements of Comprehensive Income (Loss) for the:

| | Year ended December 31, 2014 | | |
|---|---|---|---|
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
| Revenues | 22,134 | (690) | 21,444 |
| Cost of revenues | 14,654 | (686) | 13,968 |
| Gross profit | 7,480 | (4) | 7,476 |
| Sales and marketing expenses | 2,387 | 677 | 3,064 |
| General and administrative expenses | 469 | - | 469 |
| Operating income | 4,624 | (681) | 3,943 |
| Finance income | (269) | - | (269) |
| Income before income tax | 4,893 | (681) | 4,212 |
| Income tax expenses | 1,260 | (170) | 1,090 |
| Net and comprehensive income | 3,633 | (511) | 3,122 |

| | Year ended December 31, 2013 | | |
|---|---|---|---|
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
| Revenues | 5,588 | 315 | 5,903 |
| Cost of revenues | 4,455 | 330 | 4,785 |
| Gross profit | 1,133 | (15) | 1,118 |
| Sales and marketing expenses | 665 | - | 665 |
| General and administrative expenses | 419 | - | 419 |
| Operating income | 49 | (15) | 34 |
| Finance expenses | 371 | - | 371 |
| Loss before income tax | (322) | (15) | (337) |
| Income tax benefit | (53) | (4) | (57) |
| Net and comprehensive loss | (269) | (11) | (280) |

Balance Sheet as of (affected line items only):

| | December 31, 2014 | | |
|---|---|---|---|
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
| Income tax payable | 310 | (119) | 191 |
| Deferred income tax | 555 | (132) | 423 |
| Accrued expenses and accounts payable with respect to Projects | 3,568 | 314 | 3,882 |
| Progress payments in excess of accumulated costs with respect to projects | 4,956 | 690 | 5,646 |
| Shareholders' Equity | 2,478 | (753) | 1,725 |

      c.    *Third*, Ability disclosed that it had committed a possible violation of Section 402 of the Sarbanes-Oxley Act, the enhanced conflict of interest provision.  Section 402

24

makes it unlawful for any issuer to extend or maintain credit in the form of a personal loan to any director or executive officer of that issuer.  Ability discovered that "certain amounts were outstanding as of December 31, 2015"; the outstanding balance was repaid in full by the Ability, Ltd. shareholders.[22]

62.     Additional developments demonstrate the severity of the untrue and/or misleading statements in the Registration Statement: (1) Ability disclosed on May 2, 2016 that it had authorized an internal investigation to be overseen by its audit committee into the facts and circumstances giving rise to the May 2016 restatement; (2) on February 15, 2017, the Company announced that the SEC had opened an investigation into Ability's transaction with Cambridge and the May 2016 accounting restatement; (3) Benjamin Gordon, Mitchell Gordon, and Derek Zissman – all members of the Ability Board of Directors and specifically members of the audit committee – resigned, leaving the Company in December 2016, and their replacements – Amos Malka, Amnon Dick, and Shalom Singer – subsequently joined the Ability Board of Directors, but abruptly resigned only a few months later, on April 9, 2017, along with two more directors, Meir Moshe and Efraim Halevy; (4) on May 16, 2017, the Company announced that its auditor has substantial doubt about its ability to continue as a going concern; and (5) on June 8, 2017, the Company announced that it received notification on June 6 that it was not in compliance with the minimum bid price requirement set forth in NASDAQ's rules, and thus could be delisted.

**E.     Ability, Gordon, Hurgin, and BDO Ziv Haft are liable under the Securities Act.**

63.     As the issuer, Ability is strictly liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement.

---

[22] 2015 Form 20-F, at 27.

64.     Defendant Gordon is strictly liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement because he signed the Registration Statement.

65.     Defendant Hurgin is strictly liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement because he consented to the use of his name and to being named in the Registration Statement as a person expected to serve as a director of Holdco.

66.     Defendant BDO Ziv Haft is strictly liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement because it prepared and certified the audit report that constituted a part of the Registration Statement and that was used in connection with the Registration Statement.  That audit report contained untrue and misleading statements and omissions.  BDO Ziv Haft consented to the use in the Registration Statement of its audit report relating to Ability, Ltd.'s 2013 and 2014 year-end consolidated financial statements, and further consented to the Registration Statement's reference to it being an "expert."

67.     All of the Class Members bought their Ability shares in a market containing only shares issued under the Registration Statement, and thus each Class Member acquired their Ability shares pursuant and traceable to the Registration Statement.  There have been no subsequent offerings of Ability shares.

**F.     Claims for relief under the Securities Act.**

*Count One*

**Violation of Section 11 of the Securities Act
Against Defendants Ability, Hurgin, Gordon, and BDO Ziv Haft**

26

68.    Lead Plaintiffs repeat and re-allege each allegation set forth above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.  This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

69.    This claim is asserted against Defendants Ability, Anatoly Hurgin, Benjamin Gordon, and BDO Ziv Haft (the "Section 11 Defendants"), and is based upon Section 11 of the Securities Act.

70.    The Registration Statement contained untrue statements of material fact and omitted material facts necessary to render statements not misleading.

71.    Lead Plaintiffs and members of the Class acquired shares pursuant and/or traceable to the Registration Statement.  All of the Ability shares in the market are traceable to the Registration Statement.  There has been no prior or subsequent offering or Registration Statement.

72.    At the time they obtained their shares, Lead Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

73.    The Section 11 Defendants are strictly liable to Lead Plaintiffs and all other persons who purchased or otherwise acquired shares sold pursuant to the Registration Statement.

74.    Each of the Section 11 Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Section 11 Defendants' failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration

27

Statement, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Section 11 Defendants are strictly liable to Lead Plaintiffs and the Class.

75.     This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

76.     Lead Plaintiffs and members of the Class have sustained damages.  The value of their shares has declined substantially, subsequent to, and due to, the violations of the Section 11 Defendants named in this claim.  By the time the first complaint in this case was originally filed on May 25, 2016, Ability's stock price had fallen to $2.74.

77.     By virtue of the foregoing, Lead Plaintiffs and the other members of the Class are entitled to damages under Section 11.

### Count Two

**Violation of Section 15 of the Securities Act**
**Against Defendants Hurgin, Gordon, and Levin**

78.     Lead Plaintiffs repeat and re-allege each allegation set forth above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.  This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

79.     This claim is asserted against Defendants Anatoly Hurgin, Avi Levin, and Benjamin Gordon, and is based upon Section 15 of the Securities Act.

80.     The above allegations show a primary violation of the Securities Act.

28

81.     Defendants Hurgin, Levin, and Gordon, by virtue of their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Ability within the meaning of Section 15 of the Securities Act.  Defendants Hurgin, Levin, and Gordon had the power, influence, and knowledge – and exercised the same – to cause Ability to engage in the acts described herein.

82.     Defendants Hurgin, Levin, and Gordon at all relevant times participated in the operation and management of Ability, and conducted and participated, directly and indirectly, in the conduct of Ability's business affairs.  Defendants Hurgin, Levin, and Gordon were under a duty to disseminate accurate and truthful information with respect to Ability's financial condition.  Because of their positions of control and authority as officers and directors of Ability, Defendants Hurgin, Levin, and Gordon were able to, and did, control the contents of the Registration Statement, which contained materially untrue and/or misleading statements.

83.     Defendants Hurgin, Levin, and Gordon's control, ownership, and positions made them privy to and provided them with knowledge of the material facts concealed from Lead Plaintiffs and members of the Class.

84.     By reason of the aforementioned conduct, Defendants Hurgin, Levin, and Gordon are liable under Section 15 of the Securities Act to Lead Plaintiffs and the members of the Class who purchased or acquired shares pursuant to the Registration Statement.  As a direct and proximate result of the conduct of Defendants Hurgin, Levin, and Gordon, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of shares pursuant to the Registration Statement.

## EXCHANGE ACT ALLEGATIONS

**A.      Hurgin, Gordon, and Levin were desperate to complete the Business Combination between Cambridge and Ability, Ltd. before December 23, 2015.**

85.      As noted, Cambridge had a pressing time deadline that presented a powerful incentive to quickly consummate a deal: its failure to complete a business combination by June 23, 2015 – or by December 23, 2015, assuming a definitive agreement for a deal was in place by June 23 – would result in its liquidation, *i.e.*, redemption of 100% of the outstanding public shares at a per-share price, payable in cash to its shareholders.

86.      This had compelling personal financial consequences to Gordon: he was not eligible to receive a cash redemption of his shares if Cambridge failed to complete a timely Business Combination; his shares in Cambridge – valued at $620,000 as of November 24, 2015 – would become worthless; and the personal loans he made to Cambridge – totaling approximately $350,000 – would not be repaid absent a deal.  In other words, Cambridge's failure to effect a business combination would have resulted in approximately $1 million in personal losses to Gordon.

87.      By May 2015, Cambridge was desperate: it met with a distribution company in March 2014 about a potential combination, but the deal fell apart in July 2014.   It then considered combining with another target, Parakou Tankers, Inc., and even entered into a merger agreement, but that deal also fell apart in May 2015.

88.      Cambridge then turned to Ability, Ltd., a company far outside of Cambridge's focus and expertise.   Cambridge had told its investors it was focused on the supply chain industry, but Ability, Ltd. was in a totally different business – a company in the interception and decryption industries.  Indeed, this mismatch raised a red flag with the SEC such that on October 14, 2015, during its review of the Business Combination, the SEC wrote a letter asking for an

2179127.11

explanation of why Cambridge decided to consider a combination with Ability, Ltd., given that it was so far outside of Cambridge's industry focus.

89.     Despite the mismatch, Cambridge took steps towards a combination and executed a non-disclosure agreement on June 3, 2015.  On September 6, 2015, Cambridge and Ability, Ltd. entered into the Business Combination agreement.

90.     In promoting the Business Combination, Ability, Hurgin, Gordon, and Levin ("Exchange Act Defendants") touted several features of Ability's business to investors.  They described Ability as a high-growth company with very large year-over-year increases in revenue and net income.  They noted that Ability had yet to tap into the "huge" American market, and that the market would be of "strategic importance" to Ability.  They highlighted Ability's strategy of being the first to introduce certain technologies to the market, stating that this strategy would continue to propel high levels of growth and wide profit margins.  Consistent with this sales pitch, the Exchange Act Defendants presented to investors information about a new "[t]ransformational" Ability product known as "Ultimate Interceptor," or "ULIN," a "[n]ew technology for interception of mobile devices" that was "[u]nique to Ability," had "[n]o known competitors," and was "[d]eveloped in house."[23]  The effect of these representations was to paint Ability as a lean and aggressively growing company with new technologies that were developed in-house and unique to it.

91.     Cambridge's shareholders had to vote to approve the Business Combination.  On December 22, 2015, Cambridge held a special meeting during which its eligible shareholders voted to approve the combination with Ability, Ltd.  On December 23, 2015, the transactions

---

[23] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425, November 2015, at 20.

constituting the Business Combination closed, and approximately 25,700,000 shares of Ability (renamed from Holdco) common stock began trading on the NASDAQ, under the ticker "ABIL."

92.    In connection with promoting the Business Combination, persuading Cambridge shareholders to approve it, and inflating and maintaining the value of Ability's common stock, the Exchange Act Defendants made multiple false and misleading statements that fell into several categories:

a.    *First*, the Exchange Act Defendants presented key financial metrics about Ability that were false when they were made;

b.    *Second*, the Exchange Act Defendants represented that their financial statements presented fairly, in all material respects, the financial position of the Company in conformity with U.S. generally accepted accounting principles, or "GAAP," a statement that was false and misleading when it was made, *see supra* ¶¶ 42-50;

c.    *Third*, the Exchange Act Defendants suppressed or recklessly omitted that Ability's internal controls over financial reporting suffered from multiple material weaknesses that rendered the Company's financial statements materially false, misleading, and unreliable; and

d.    *Fourth*, the Exchange Act Defendants represented that Ability had developed a new, transformational technology that was unique to Ability and developed in-house, a statement that was false and misleading when it was made.

93.    The Exchange Act Defendants either made and/or had ultimate authority over the statements made, including their content and whether and how to communicate them: as stated in the Business Combination agreement, Ability and Cambridge were contractually obligated to work together to prepare and file with the SEC registration statements and a proxy statement and

prospectus, to respond together to SEC comments regarding any securities filings, and to seek consent from one another before making any public announcement related to the Business Combination.[24]

**B.    Ability, Hurgin, Gordon, and Levin suppress or recklessly fail to disclose that Ability's internal controls over financial reporting suffered from material weaknesses of such severity that its financials were materially false, misleading, and unreliable.**

94.    In their campaign to persuade Cambridge's shareholders to approve the Business Combination and to boost and maintain the price of Ability's stock, the Exchange Act Defendants touted Ability's financial performance.  They in particular highlighted Ability's growth: they emphasized the Company's year-over-year improvement in revenues, stating that "[t]otal revenues for the year ended December 31, 2014 were $22.1 million[,] an increase of approximately $16.5 million, or 294%, compared to total revenues of $5.6 million for the year ended December 31, 2013"; and they promoted the Company's growing net income, stating, among other things, that "[n]et and comprehensive income for the year ended December 31, 2014 were $3.6 million, an increase of $3.9 million, compared to net and comprehensive loss of $0.3 million for the year ended December 31, 2013."[25]

95.    In their feverish highlighting of these numbers, however, the Exchange Act Defendants failed to disclose that Ability's internal controls over financial reporting suffered from multiple material weaknesses – and in doing so, intentionally suppressed and/or recklessly disregarded the risk that Ability's financials were materially false, misleading, and unreliable. Indeed, as a consequence of these weaknesses, Ability had to restate the very financials the

---

[24] Agreement and Plan of Reorganization by and among Cambridge Capital Acquisition Corporation, Cambridge Holdco Corp., Ability Computer & Software Industries Ltd. and the Securityholders of Ability Computer & Software Industries Ltd., September 6, 2015, §§ 5.1, 5.17.

[25] Registration Statement, at 152.

Exchange Act Defendants had touted *less than six months after the Business Combination closed*. In presenting these financials about Ability without providing the full picture regarding its internal controls over financial reporting, the Exchange Act Defendants omitted relevant information necessary to make their statements regarding Ability's financials not misleading.

96.     Indeed, the Exchange Act Defendants failed to disclose that Ability had multiple, serious material weaknesses in its internal controls over financial reporting. Instead, the Exchange Act Defendants falsely represented that "[w]e [Ability] have made, and will continue to make, changes to our internal controls and procedures for financial reporting and accounting systems to meet our reporting obligations as a publicly traded company," cautioning that "the measures we take may not be sufficient to satisfy our obligations as a publicly traded company." The Exchange Act Defendants insisted that they were taking action to improve their internal controls: in the Proxy Statement, they repeated that Ability was "in the process of addressing [its] internal controls over financial reporting," would "establish formal policies, processes and practices related to financial reporting," and would "identify key financial reporting risks" and assess the "potential impact and linkage of those risks to specific areas and activities within" the Company. Ability further stated – in a single sentence, with no explanation – that "a material weakness was noted in our financial reporting closing process with respect to cut-off procedures relating to expenses."[26] Moreover, the Exchange Act Defendants advised in the Proxy Statement that Ability's internal controls over financial reporting "do not currently meet all of the standards contemplated by Section 404 of the Sarbanes-Oxley Act," and they further stated that as an "emerging growth company," Ability was exempt from Section 404(b) of Sarbanes-Oxley, *i.e.*,

---

[26] Proxy Statement, at 56.

the requirement that it obtain an assessment of the effectiveness of its internal controls over financial reporting from an independent registered public accounting firm.

97.    But these statements did not tell – and intentionally or recklessly muddled – the full picture: that Ability's internal controls over financial reporting were so riddled with material weaknesses that the Exchange Act Defendants' failure to disclose those weaknesses and their full extent constituted intentional suppression and/or reckless disregard of the risk that the Company's financial statements, offered in connection with the Business Combination, were materially false, misleading, and unreliable.  Given their access to and intimate familiarity with Ability's financials, financial infrastructure, and internal controls, the Exchange Act Defendants knew the true scope of Ability's internal control problems and therefore either knew or were reckless in disregarding that Ability's financial statements were unreliable.  Defendant Gordon had full access to Ability's financials as a result of the purported due diligence he conducted in connection with the Business Combination, and Defendants Hurgin and Levin, as the two top officers in a small company of less than 20 employees, were intimately involved in the day-to-day business of the Company.  Among other things, Defendant Hurgin alone negotiated contracts with customers and Defendant Levin was the sole Ability employee with any accounting acumen.

98.    Indeed, as a consequence of the Exchange Act Defendants rushing to close the Business Combination without regard to the lack of internal controls and without properly applying GAAP principles, the Company had to restate its financial statements for 2013, 2014, and 2015 *less than six months after the Business Combination closed*.  In other words, rather than properly advising investors of the serious problems with its internal controls, the Exchange Act Defendants suppressed or omitted the true number, degree, and nature of Ability's material

weaknesses until *after* the Business Combination with Cambridge was consummated, instead choosing to highlight their supposed strong financials to investors.

99.     When the truth was revealed on Ability's first earnings call as a publicly traded company, investors learned several important new features of Ability's flawed internal controls. *First*, Ability did not have "a" material weakness, it had *several*.  *Second*, Ability's material weaknesses were not limited to expenses; rather, its material weaknesses had an impact on how it accounted for expenses *and* revenue, and were responsible for a possible violation of Section 402 of Sarbanes-Oxley, the enhanced conflict of interest provision.  *Third*, Ability's material weaknesses were so extensive that they necessitated a restatement of its financials over a course of years: Ability restated its consolidated financial statements as of December 31, 2014, and for the two years in the period then ended, and as of June 30 and September 30 in 2015 and 2014, and for the six and nine month periods then ended, respectively.  *Finally*, Ability's material weaknesses meant that its reports filed with the SEC provided an incomplete picture of Ability to pre- and post-Business Combination investors in its filings under the Exchange Act.[27]

100.     The Exchange Act Defendants' statements regarding Section 404(b) of Sarbanes-Oxley and their status as an "emerging growth" company were false and misleading: in fact, Ability had presented its financials as accurate but failed to disclose complete and accurate information about the true state of its internal controls.  Like all publicly-traded companies, Ability was required under Section 13 of the Exchange Act (added by the Foreign Corrupt Practices Act of 1977) to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that, among other things, "transactions are recorded as necessary . . . to permit preparation of financial statements *in conformity with generally accepted*

---

[27]  2015 Form 20-F, at 27.

*accounting principles* or any other criteria applicable to such statements."[28]   Against this backdrop, the Exchange Act Defendants' presentation of Ability's financials, their statements that Ability complied with GAAP, their highlighting in presentations to investors the very numbers that they restated less than six months later, and their failure to fully disclose the extent of Ability's material weaknesses in its internal controls over financial reporting demonstrates that the Exchange Act Defendants' statements regarding Ability's financials were materially misleading due to omissions regarding Ability's internal controls, and those omissions worked to deceive investors about Ability's true state by materially altering Ability's risk profile.

101.   When the truth was finally disclosed, investors responded with shock: the price of Ability shares plunged by approximately 33% in a single day of trading, falling from the prior closing price of $7.32 per share to close at $4.90 per share on May 2, 2016.

### C.   The Exchange Act Defendants' false and misleading statements during the Class Period.

102.   On **September 8, 2015**, Defendants Ability, Hurgin, and Gordon caused a press release to be issued announcing the Business Combination between Cambridge and Ability.  In that press release, Ability, Hurgin, and Gordon touted Ability's "consistent growth" and stated as proof of that Ability's audited revenue and net income figures in 2013 and 2014: $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively.  They touted Ability's "[h]igh growth" during the first half of 2015, highlighting that revenue and net income increased 162% and 394%, respectively, compared to the first half of 2014.[29]  These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30,

---

[28] 15 U.S.C. § 78m(b)(7) (emphasis added).

[29] "Cambridge Capital Acquisition Corporation to Merge with Ability Computers & Software Industries Ltd," BusinessWire, September 8, 2015.

2015, June 30, 2014, and September 30, 2014, were misstated, not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that Defendants Ability, Hurgin, and Gordon failed to disclose.

103. On **September 10, 2015**, Defendants Ability, Hurgin, and Gordon caused to be filed with the SEC a presentation that they gave to investors regarding Ability and its Business Combination with Cambridge. In that presentation, Defendants Ability, Hurgin, and Gordon touted Ability's "[r]apidly growing revenues and net income," and highlighted how "[r]evenues for the six months ended June 30, 2015 rose 162% and net income increased 394% compared to the same period in 2014."[30] Defendants Ability, Hurgin, and Gordon again stated the false financial metrics described in ¶ 102, highlighting them as proof of Ability's "Strong Organic Growth and High Margins":[31]

---

[30] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425, September 2015, at 3.

[31] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425, September 2015, at 18.



104.    Defendants Ability, Hurgin, and Gordon repeated the false financials at the end of

their presentation:[32]

---

[32] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425, September 2015, at 18.



## Financial Summary

| Financial Summary ($ in 000s)<br><br>(2015 six-month, LTM data unaudited) | 2013 | 2014 | Six Months Ended June 30, 2014 | Six Months Ended June 30, 2015 | LTM June 30, 2015 |
|---|---|---|---|---|---|
| Revenue | $5,588 | $22,134 | $16,440 | $43,043 | $48,737 |
| Cost of Goods Sold | $4,455 | $14,654 | $9,564 | $20,516 | $25,606 |
| Gross Profit | $1,133 | $7,480 | $6,876 | $22,527 | $23,131 |
| *Gross Profit Margin* | *20.3%* | *33.8%* | *41.8%* | *52.3%* | *47.5%* |
| Operating Profit/Loss | $49 | $4,624 | $4,580 | $20,069 | $20,113 |
| *Operating Profit Margin* | *0.9%* | *20.9%* | *27.9%* | *46.6%* | *41.3%* |
| Net Income | -$269 | $3,633 | $3,404 | $16,799 | $17,028 |
| *Net Income Margin* | *-4.8%* | *16.4%* | *20.7%* | *39.0%* | *34.9%* |

24



105.    These statements were materially false and misleading because, as later admitted,

the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods

ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were

misstated, not prepared in accordance with GAAP, and were the product of a financial reporting

process with multiple material weaknesses in its internal controls, a fact that Defendants Ability,

Hurgin, and Gordon failed to disclose.

106.    On **September 23, 2015**, Defendants Ability, Hurgin, and Gordon caused to be

filed with the SEC a presentation that they gave to investors regarding Ability and its Business

Combination with Cambridge.   In that presentation, Defendants Ability, Hurgin, and Gordon

again stated the false financial metrics, touting Ability's "[h]igh growth," and stated as proof of

40

that Ability's audited revenue and net income figures in 2013 and 2014: $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively.[33]  These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that Defendants Ability, Hurgin, and Gordon failed to disclose.

107.    On **September 30, 2015**, Defendants Ability, Hurgin, and Gordon caused to be filed with the SEC a presentation that they gave to investors regarding Ability and its Business Combination with Cambridge.  In that presentation, Defendants Ability, Hurgin, and Gordon again stated the false financial metrics, touting Ability's "[h]igh growth," and stated as proof of that Ability's audited revenue and net income figures in 2013 and 2014: $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively.[34]  These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that Defendants Ability, Hurgin, and Gordon failed to disclose.

108.    For the reasons discussed in ¶¶ 127-136, Defendants Ability, Hurgin, and Gordon knew and/or were reckless in not knowing that the statements in ¶¶ 102-107 were false and misleading.  Defendant Hurgin – as CEO and co-founder of Ability, Ltd. – had a particularly

---

[33] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (Fall 2015), at 16, 22.

[34] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (Fall 2015), at 16, 24.

deep knowledge of the Company, and he therefore was in a unique position to know – or had access to information demonstrating – that the statements regarding Ability's financials, its accounting processes, and its internal controls over financial reporting were false and misleading at the time they were made.  In the run-up to the Business Combination, Defendant Gordon obtained insider access to and deep knowledge of the Company's financial results, financial performance, financial infrastructure, internal systems, financial projections, and financial controls, and that information combined with his background in finance and business placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made.  Moreover, Hurgin and Gordon made these false and misleading statements because they were engaged in a desperate scheme to convince Cambridge shareholders to vote in favor of the Business Combination with Ability, Ltd., as they each had substantial personal financial incentives to complete the transaction.

109.   On **November 16, 2015**, the Exchange Act Defendants caused to be filed with the SEC a presentation that they gave to investors regarding Ability and its Business Combination with Cambridge.  During that presentation, the Exchange Act Defendants repeated the false financial metrics described in ¶¶ 102-104 – that Ability's audited revenue and net income figures in 2013 and 2014 were $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively – highlighting them as proof of Ability's "High Growth and Margins":[35]

---

[35] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 21.







110.   These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, were not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that the Exchange Act Defendants failed to disclose.

111.   The Exchange Act Defendants also represented in the same presentation that Ability had developed a "[t]ransformational" new technology called the "Ultimate Interceptor," or "ULIN."  ULIN was described as a "[n]ew technology for interception of mobile devices" that was "[u]nique to Ability," with "[n]o known competitors," and "[d]eveloped in house."   Its

43

revenue model involved a system, a software license, and maintenance and support.   The Exchange Act Defendants stated that the first orders for ULIN were expected in the first quarter of 2016, and that ULIN represented the possibility for "[h]igh margin expansion."[36]   These statements were materially false and misleading because, as later disclosed, ULIN was not developed in house or unique to Ability, but rather was designed and owned by an unrelated third-party supplier who gave Ability a temporary and exclusive license to sell it for two years, subject to a variety of conditions.   Under that license, the unrelated third-party supplier would receive 50% of Ability's net income relating to sales of ULIN.

112.     On **November 18, 2015**, the Exchange Act Defendants caused to be filed with the SEC a transcript of an investor presentation "road show."   Defendants Hurgin, Levin, and Gordon spoke during the presentation.   Levin stated that Ability's financials were strong and he specifically touted the false and misleading metrics discussed in ¶¶ 102-104: in 2014, "we had revenue of 20 million. That's almost 3 times as much. And if you go back to 2013, you'll see 5.5 million revenue, very significant growth in a couple of years from 5 million to 58 million. . . . If you look at net income, this year we expect it to be at 20 million, last year we had about 4.6 million, 4 times as much."[37]   These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, were not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that the Exchange Act Defendants failed to disclose.

---

[36] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 17, 19.

[37] Ability, Internet Investor Presentation Transcript, on Form 425, November 18, 2015, at 4.

113.    On **November 24, 2015**, the Exchange Act Defendants caused to be filed with the SEC a presentation that they gave to investors regarding Ability and its Business Combination with Cambridge.  During that presentation, the Exchange Act Defendants again made false and misleading statements regarding Ability described in ¶¶ 102-104: they touted Ability's "[h]igh growth," and stated as proof of that Ability's audited revenue and net income figures in 2013 and 2014: $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively.[38]  These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, were not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that the Exchange Act Defendants failed to disclose.

114.    Moreover, the Exchange Act Defendants again made false and misleading statements regarding ULIN, as described in ¶ 111.  They represented that Ability had developed a "[t]ransformational" new technology called "ULIN."   ULIN was described as a "[n]ew technology for interception of mobile devices" that was "[u]nique to Ability," with "[n]o known competitors," and "[d]eveloped in house."   Its revenue model involved a system, a software license, and maintenance and support.  The Exchange Act Defendants stated that the first orders for ULIN were expected in the first quarter of 2016, and that ULIN represented the possibility for "[h]igh margin expansion."[39]   These statements were materially false and misleading because, as the Exchange Act Defendants later disclosed, ULIN was not developed in house or

---

[38] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 22.

[39] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 20.

2179127.11

unique to Ability, but rather was designed and owned by an unrelated third-party supplier who gave Ability a temporary and exclusive license to sell it for two years, subject to a variety of conditions.  Under that license, the unrelated third-party supplier would receive 50% of Ability's net income relating to sales of ULIN.

115.     On **November 27, 2015**, the Exchange Act Defendants caused to be filed, and Defendant Gordon signed, the Company's third amended Form S-4 Registration Statement, in which the Exchange Act Defendants made the false and misleading statements described above at ¶¶ 51-60.

116.     On **November 30, 2015**, the Exchange Act Defendants caused to be filed with the SEC a presentation that they gave to investors regarding Ability and its Business Combination with Cambridge.  During that presentation, the Exchange Act Defendants repeated the false and misleading financial metrics described in ¶¶ 102-104: that Ability's audited revenue and net income figures in 2013 and 2014 were $5.6 million and -$0.3 million, and $22.1 million and $3.6 million, respectively.[40]  These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014, 2013, and 2012, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, were not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that the Exchange Act Defendants failed to disclose.

117.     Moreover, the Exchange Act Defendants again made false and misleading statements regarding ULIN, as described in ¶ 111.  The Exchange Act Defendants represented that Ability had developed a "[t]ransformational" new technology called "ULIN."  ULIN was

---

[40]  Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 20, 22.

described as a "[n]ew technology for interception of mobile devices" that was "[u]nique to Ability," with "[n]o known competitors," and "[d]eveloped in house." Its revenue model involved a system, a software license, and maintenance and support. The Exchange Act Defendants stated that the first orders for ULIN were expected in the first quarter of 2016, and that ULIN represented the possibility for "[h]igh margin expansion."[41] These statements were materially false and misleading because, as later disclosed, ULIN was not developed in house or unique to Ability, but rather was designed and owned by an unrelated third-party supplier who gave Ability a temporary and exclusive license to sell it for two years, subject to a variety of conditions. Under that license, the unrelated third-party supplier would receive 50% of Ability's net income relating to sales of ULIN.

118.   For the reasons discussed in ¶¶ 127-136, the Exchange Act Defendants knew and/or were reckless in not knowing that the statements in ¶¶ 109-117 were false and misleading. Defendant Hurgin – as CEO and co-founder of Ability, Ltd. – had a particularly deep knowledge of the Company, and he therefore was in a unique position to know – or had access to information demonstrating – that the statements regarding Ability's financials, its accounting processes, its internal controls over financial reporting, and its ownership of ULIN were false and misleading at the time they were made. In the run-up to the Business Combination, Defendant Gordon obtained insider access to and deep knowledge of the Company's business, financial results, financial performance, financial infrastructure, internal systems, financial projections, and financial controls, and that information combined with his background in finance and business placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the

---

[41] Ability, Presentation: "Proposed Merger with Cambridge Capital Acquisition Corporation," on Form 425 (November 2015), at 20.

time they were made.  Moreover, Hurgin and Gordon made these false and misleading statements because they were engaged in a desperate scheme to convince Cambridge shareholders to vote in favor of the Business Combination with Ability, Ltd., and they each had substantial personal, financial incentives to complete the transaction.  Defendant Levin was the only person in the Company with a background in finance and accounting, and that knowledge combined with his status as the CFO of a very small company that did not previously have one, placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made.

119.    On **December 2, 2015**, the Exchange Act Defendants caused to be filed, and Defendant Gordon signed, the Proxy Statement regarding the Business Combination between Cambridge and Ability, Ltd.  In that Proxy Statement, the Exchange Act Defendants repeated the false and misleading statements described in ¶¶ 51-60: that Ability's growth in total revenues and cost of revenues for the six months ended June 30, 2015, when compared to the same period ended June 30, 2014, constituted a 162% increase and a 114% increase, respectively; that Ability's revenues for the year ended December 31, 2014 were $22.1 million, an increase of approximately $16.5 million, or 294%, compared to total revenues of $5.6 million for the year ended December 31, 2013; and that Ability's net income grew from a loss of $269,000 in 2013 to $3.6 million in 2014.  The Exchange Act Defendants further affirmed that these financial statements were "prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP")," and that Ability abided by revenue recognition policies, *i.e.*, "when a sale arrangement contains multiple elements, Ability allocates revenue to each element based on estimated selling price," that "[r]evenues from sales of products are recognized when Ability has delivered products to the customer[,] retained final acceptance, the revenue can

48

be reliably measured and collectability of the receivables is reasonably assured," and that "[r]evenues from projects are recognized using the completed contract method to determine the appropriate amount in a given period," under which "costs are accumulated on the balance sheet until the contract is complete or substantially complete."[42]  These statements were materially false and misleading because, as Defendants later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, not prepared in accordance with GAAP, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that the Exchange Act Defendants failed to disclose.

120.    Moreover, the Exchange Act Defendants' statements about Ability's internal controls over financial reporting were materially false and misleading when made.  In particular, the statements (1) that its internal controls "do not currently meet all of the standards contemplated by Section 404 of the Sarbanes-Oxley Act," (2) that Ability "made, and will continue to make, changes to our internal controls and procedures for financial reporting and accounting systems to meet our reporting obligations as a publicly traded company," (3) that "the measures we take may not be sufficient to satisfy our obligations as a publicly traded company," (4) that Ability was "in the process of addressing [its] internal controls over financial reporting," (5) that Ability would "establish formal policies, processes and practices related to financial reporting," (6) that Ability would "identify key financial reporting risks" and assess the "potential impact and linkage of those risks to specific areas and activities within" the Company, and (7) that "a material weakness was noted in our financial reporting closing process with

---

[42] Proxy Statement, at 30, 31, 107, 157-62.

respect to cut-off procedures relating to expenses"[43] were materially misleading because the Exchange Act Defendants omitted disclosure of the full extent of the material weaknesses in Ability's internal controls over financial reporting, *i.e.*, that Ability's internal controls over financial reporting were so riddled with material weaknesses that the Company's financial statements, offered in connection with the Business Combination, were significantly likely to be materially false and unreliable. *See supra* ¶ 97-100.

121.    On **December 30, 2015**, after the Business Combination closed, Ability filed, and Defendant Hurgin signed, Ability's Form 8-K, in which Ability and Hurgin repeated the false and misleading statements regarding Ability by incorporating by reference all of the operative parts of the December 2, 2015 Proxy Statement.  Ability and Hurgin again made the false and misleading statements regarding Ability's financials described in ¶¶ 51-60: that Ability's growth in total revenues and cost of revenues for the six months ended June 30, 2015, when compared to the same period ended June 30, 2014, constituted a 162% increase and a 114% increase, respectively; that Ability's revenues for the year ended December 31, 2014 were $22.1 million, an increase of approximately $16.5 million, or 294%, compared to total revenues of $5.6 million for the year ended December 31, 2013; and that Ability's net income grew from a loss of $269,000 in 2013 to $3.6 million in 2014.  Ability and Hurgin further affirmed that these financial statements were "prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP")," and that Ability abided by revenue recognition policies, *i.e.*, "when a sale arrangement contains multiple elements, Ability allocates revenue to each element based on estimated selling price," that "[r]evenues from sales of products are recognized when Ability has delivered products to the customer[,] retained final acceptance, the

---

[43] Proxy Statement, at 56.

revenue can be reliably measured and collectability of the receivables is reasonably assured," and that "[r]evenues from projects are recognized using the completed contract method to determine the appropriate amount in a given period," under which "costs are accumulated on the balance sheet until the contract is complete or substantially complete." These statements were materially false and misleading because, as later admitted, the Company's consolidated financial statements for year-end 2014 and 2013, and for the periods ended June 30, 2015, September 30, 2015, June 30, 2014, and September 30, 2014, were misstated, not prepared in accordance with GAAP or Ability's publicly disclosed revenue recognition policy, and were the product of a financial reporting process with multiple material weaknesses in its internal controls, a fact that Ability and Hurgin failed to disclose.[44]

122.    Moreover, Ability and Hurgin repeated their false and misleading statements regarding Ability's internal controls over financial reporting by incorporating by reference all of the operative parts of the December 2, 2015 Proxy Statement: that Ability's internal controls "do not currently meet all of the standards contemplated by Section 404 of the Sarbanes-Oxley Act," that Ability "made, and will continue to make, changes to our internal controls and procedures for financial reporting and accounting systems to meet our reporting obligations as a publicly traded company," that "the measures we take may not be sufficient to satisfy our obligations as a publicly traded company," that Ability was "in the process of addressing [its] internal controls over financial reporting," that Ability would "establish formal policies, processes and practices related to financial reporting," that Ability would "identify key financial reporting risks" and assess the "potential impact and linkage of those risks to specific areas and activities within" the Company, and that "a material weakness was noted in our financial reporting closing process

---

[44] Ability Inc., Form 8-K (December 23, 2015), at 5 (incorporating "Management's Discussion and Analysis of Financial Condition and Results of Operations" discussion).

with respect to cut-off procedures relating to expenses[.]"[45]   These statements were materially misleading because Ability and Hurgin omitted disclosure of the full extent of the material weaknesses in Ability's internal controls over financial reporting, *i.e.*, that Ability's internal controls over financial reporting were so riddled with material weaknesses that the Company's financial statements, offered in connection with the Business Combination, were significantly likely to be materially false and unreliable.  *See supra* ¶ 97-100.

123.   For the reasons discussed in ¶¶ 127-136, the Exchange Act Defendants knew and/or were reckless in not knowing that the statements in ¶¶ 119-122 were false and misleading. Defendant Hurgin – as CEO and co-founder of Ability, Ltd. – had a particularly deep knowledge of the Company, and he therefore was in a unique position to know – or had access to information demonstrating – that the statements regarding Ability's financials, its accounting processes, its internal controls over financial reporting, and its ownership of ULIN were false and misleading at the time they were made.   In the run-up to the Business Combination, Defendant Gordon obtained insider access to and deep knowledge of the Company's business, financial results, financial performance, financial infrastructure, internal systems, financial projections, and financial controls, and that information combined with his background in finance and business placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made.   Moreover, Hurgin and Gordon made these false and misleading statements because they were engaged in a desperate scheme to convince Cambridge shareholders to vote in favor of the Business Combination with Ability, Ltd., and they each had substantial personal, financial incentives to complete the transaction.   Defendant Levin was the

---

[45] Ability Inc., Form 8-K (December 23, 2015), at 5 (incorporating "Risk Factors" discussion).

only person in the Company with a background in finance and accounting, and that knowledge combined with his status as the CFO of a very small company that did not previously have one, placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made.

> **D.     The truth emerges.**

124.   On February 16, 2016, Ability stated that it would announce its fourth quarter and full-year 2015 financial results before the market opened on March 3, 2016.   On March 2, however, it retracted its statement, stating that its independent audit was incomplete.   No new date was announced.   Several weeks later, on April 28, 2016, Ability stated that it would announce its fourth quarter and full-year 2015 financial results on May 2, 2016.

125.   On May 2, 2016, Ability issued a press release announcing its fourth quarter and 2015 year-end financial results, stating that it had restated its consolidated financial statements as of December 31, 2014, and for the two years in the period then ended, and as of June 30 and September 30 in 2015 and 2014, and for the six and nine month periods then ended.[46]   Ability also filed its Form 20-F with the SEC the same day.   In both the press release and the Form 20-F, Ability made several key corrective disclosures:

> a.     *First*, Ability disclosed that it had identified multiple "material weaknesses" in its internal controls over financial reporting.   It admitted that "certain amounts due to two third parties had not been timely expensed, and revenue recognition in multiple element sale transactions had not been properly allocated and timely deferred," resulting "in a restatement of the consolidated financial statements as of December 31, 2014 and for the two years in the period then ended and as of June 30 and September 30 in 2015 and 2014 and for the

---

[46] Ability Inc., Press Release: "Ability Inc. Reports Fourth Quarter and Full-Year 2015 Financial Results," May 2, 2016.

six and nine month periods then ended, respectively."[47]   The material weaknesses meant that Ability's controls did "not ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified and that such information is accumulated and communicated to our management to allow for timely decisions regarding required disclosure."[48]   Ability declined to provide an assessment of its internal controls over financial reporting as of December 31, 2015.[49]

        b.    *Second*, Ability restated its consolidated financial statements for 2014 and 2013 "to reflect correction of errors with respect to previously unrecognized commissions due to a vendor on revenues that were recognized in 2014, 2013 and 2012; improper allocation and timing of revenue recognition from connection to supportive infrastructure in multiple element sale transactions recognized in 2014, 2013 and 2012; and previously unrecognized commissions due to a third party on cost of revenues that were recognized in 2014."[50]   This restatement resulted in material adjustments to Ability's financials, including the following two examples: net and comprehensive income for year-end 2014 decreased by 14%; and net and comprehensive loss for year-end 2013 (there was no profit in 2013) increased by 4%.   Ability provided no additional details on the nature of the restatement, but disclosed that it had authorized an internal investigation into the facts and circumstances surrounding the restatement.   Ability's restated financial statements read as follows:[51]

---

[47] 2015 Form 20-F, at 27.

[48] 2015 Form 20-F, at 27.

[49] 2015 Form 20-F, at 27.

[50] 2015 Form 20-F, at 47.

[51] 2015 Form 20-F, at F-20-21.

Statements of Comprehensive Income (Loss) for the:

| | Year ended December 31, 2014 | | |
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
|---|---|---|---|
| Revenues | 22,134 | (690) | 21,444 |
| Cost of revenues | 14,654 | (686) | 13,968 |
| Gross profit | 7,480 | (4) | 7,476 |
| Sales and marketing expenses | 2,387 | 677 | 3,064 |
| General and administrative expenses | 469 | - | 469 |
| Operating income | 4,624 | (681) | 3,943 |
| Finance income | (269) | - | (269) |
| Income before income tax | 4,893 | (681) | 4,212 |
| Income tax expenses | 1,260 | (170) | 1,090 |
| Net and comprehensive income | 3,633 | (511) | 3,122 |

| | Year ended December 31, 2013 | | |
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
|---|---|---|---|
| Revenues | 5,588 | 315 | 5,903 |
| Cost of revenues | 4,455 | 330 | 4,785 |
| Gross profit | 1,133 | (15) | 1,118 |
| Sales and marketing expenses | 665 | - | 665 |
| General and administrative expenses | 419 | - | 419 |
| Operating income | 49 | (15) | 34 |
| Finance expenses | 371 | - | 371 |
| Loss before income tax | (322) | (15) | (337) |
| Income tax benefit | (53) | (4) | (57) |
| Net and comprehensive loss | (269) | (11) | (280) |

Balance Sheet as of (affected line items only):

| | December 31, 2014 | | |
| | Previously reported | Adjustments | Restated |
| | (U.S. dollar in thousands) | | |
|---|---|---|---|
| Income tax payable | 310 | (119) | 191 |
| Deferred income tax | 555 | (132) | 423 |
| Accrued expenses and accounts payable with respect to Projects | 3,568 | 314 | 3,882 |
| Progress payments in excess of accumulated costs with respect to projects | 4,956 | 690 | 5,646 |
| Shareholders' Equity | 2,478 | (753) | 1,725 |

      c.    *Third*, Ability disclosed that it had committed a possible violation of Section 402 of the Sarbanes-Oxley Act, the enhanced conflict of interest provisions.  Section 402

makes it unlawful for any issuer to extend or maintain credit in the form of a personal loan to any director or executive officer of that issuer. Ability discovered that "certain amounts were outstanding as of December 31, 2015," and that the outstanding balance was repaid in full by the Ability, Ltd. shareholders.[52]

        d.    *Fourth*, Ability disclosed that its purportedly transformational ULIN technology was not developed or owned by Ability, but rather that ULIN was developed and owned by an unrelated third-party that had strict and total control over the product, and that Ability's "sales are based on a reseller agreement granting [Ability] a worldwide exclusive right to sell ULIN, which automatically terminates in October 2018 and may be terminated by either party under certain specific circumstances." Specifically, Ability disclosed for the first time that:

> *[t]he owner of ULIN is an unrelated third party supplier and, as such, we have no ability to exert any influence over the business or employees of the supplier. Further, the supplier is a newly established corporation with a short operating history and is still unknown in the industry. If the supplier ceases operations or is unable to deliver ULIN in the quantities and quality required by us, is unable to attract or retain its key personnel or fails to adequately upgrade and develop ULIN in order for it to remain competitive, our business, financial condition and results of operations would be materially adversely affected.* Further, under the reseller agreement, [Ability] must obtain the supplier's consent to, among other things, manufacture, sell or market any product which is competitive with ULIN. *If the supplier does not give its timely consent to any such action, our business, financial condition and results of operations would be materially adversely affected.*[53]

Ability disclosed that ULIN was designed and owned by an unrelated third party, that Ability owed the unrelated third party a penalty if it failed to meet minimum annual sales of $10,000,000 per year, and that ULIN had entered into this agreement with the third party in October 2015, well before they advised the market that ULIN was developed in-house:

---

[52] 2015 Form 20-F, at 27.

[53] 2015 Form 20-F, at 8 (emphasis added).

> ***On October 20, 2015, we entered into an agreement with a third party supplier who designs and licenses the ULIN products.*** This agreement may in the future account for a significant portion of our vendor costs . . . . According to the agreement, ***the supplier (an unrelated company) granted Ability an exclusive and nontransferable right and license to market, promote, advertise, sell and distribute its products, none of which are sold or marketed under the supplier's trademark, directly to customers worldwide in consideration for 50% of Ability's net income relating to those sales. The agreement determines minimum annual sales of $10 million. If Ability does not satisfy this minimum commitment at the end of any contract year, Ability is required to pay such supplier a 15% penalty against any shortfall, up to a maximum penalty of $1.5 million per year.*** Under the agreement, Ability shall pay such supplier $125,000 each month on account of the minimum commitment. The agreement has a three year term and may be terminated by a party in case of the other party's material breach, bankruptcy, insolvency, creditor assignment, liquidation, receivership or loss of control of all or substantially all of its business. Further, under the agreement, we must obtain the supplier's consent to, among other things, manufacture, sell or market any product which is competitive with ULIN.[54]

126.     In response to these disclosures, the price of Ability's shares declined on May 2, 2016 from $7.32 per share to $4.90 per share, approximately 33%, on heavy trading volume.

### E.     Defendants made these false and misleading statements with scienter.

127.     Defendants Ability, Hurgin, Gordon, and Levin made the false and misleading statements described above, *see supra* ¶¶ 102-122, intentionally, with motive and opportunity to commit this fraud, and/or recklessly. They each benefitted in a concrete and personal way from making the false and misleading statements, and/or they each knew facts or had access to information suggesting that their public statements regarding Ability were not accurate, and/or failed to check information regarding Ability that they had a duty to monitor.

128.     As stated by CW1 and in public filings, Ability is a very small company: it has always had somewhere between 8 and 15 employees, it was previously owned by only two shareholders including Defendant Hurgin, it has only one office comprising less than 1,000 square feet, and Hurgin was intimately involved in every decision regarding the Company. As

---

[54] 2015 Form 20-F, at 36 (emphasis added).

CW1 stated, Ability was essentially entirely run by Hurgin, the CEO: he mainly managed the business by himself, with help from his co-founder, Aurovksy.  Hurgin handled all business with Ability's foreign customers personally, and no one else monitored those customer relationships.  Hurgin alone negotiated all of Ability's contracts with its customers, and all new orders or meetings with prospective clients were dealt with by Hurgin alone.  Ability did not have any employees with accounting training; instead, Ability outsourced its accounting function to a small Israeli accounting firm, and Hurgin dealt with that firm directly and by himself.  CW1 stated that Ability, Ltd. did not have a chief financial officer or management meetings during CW1's tenure.  Hurgin's particularly deep knowledge touched every aspect of the Company, and he therefore was in a unique position to know – or had access to information demonstrating – that the statements regarding Ability's financials, its accounting processes, its internal controls over financial reporting, and the development and ownership of ULIN were false and misleading at the time they were made, and he therefore intentionally or recklessly made those statements or caused those statements to be made.

129.   Levin is the only person in the Company who has any formal financial training: he has a corporate finance and accounting background, is a Certified Public Accountant in the United States and Israel, previously worked at a major accounting firm (PricewaterhouseCoopers), has a college degree in economics and accounting from Ben-Gurion University of the Negev in Israel, and has an MBA from New York University's Stern School of Business.   Indeed, he touted these credentials to investors: he stated during the investor presentation in the run-up to the vote on the Business Combination that "I found that Ability is a company where I can bring my U.S. accounting, U.S. GAAP, SEC knowledge, as well as capital markets knowledge to good use.  It's a company that needs somebody like me and I think I could

be very helpful."[55]  His status as the only person in the Company with a background in finance and accounting, and his status as the CFO of a very small company that did not previously have one, placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made, and he therefore intentionally or recklessly made those statements or caused those statements to be made.

130.    Similarly, Gordon's business background – as the managing partner at a business strategic advising company, with an MBA from Harvard Business School – his in-depth due diligence of Ability and its financials, and his status as the interim CEO of Holdco, director of Ability, and member of Holdco and Ability's audit committee meant that he knew facts or had access to information suggesting that the false and misleading statements when they were made were not accurate, and/or that he failed to check information he had a duty to monitor.   As Cambridge has represented in court filings, "Cambridge's due diligence efforts were *exhaustive*, spanning two full months following the execution of the" Business Combination term sheet.[56] As further discussed in the December 2, 2015 Proxy Statement, Gordon amassed significant information about Ability's financials and internal controls during the due diligence period of the Business Combination: he had an initial call with Hurgin, among others, in which they discussed Ability's "historical financial results and its recent financial performance"; he sent his employee to Ability's office in Tel Aviv multiple times to discuss "Ability's structure, core competencies, financial infrastructure, and capabilities," as well as "the market in which Ability competes, internal systems, and financial projections"; he retained multiple consultants and a law firm to

---

[55] Form 425, Transcript of Internet Investor Presentation, at 4 (Nov. 18, 2015).

[56] Cambridge Defendants' Motion and Supporting Memorandum of Law to Dismiss Plaintiff's Verified First Amended Class Action and Derivative Complaint, *Levy v. Gordon et al.*, 2015CA003339 (Fla. 15th Cir. Ct. Nov. 16, 2015), at 8 (emphasis added).

59

conduct due diligence on Ability; he personally traveled to Ability's Tel Aviv headquarters on July 27, 2015 to meet with representatives of Ability to discuss the Company's "financial controls, the responsibilities of being a public entity and corporate governance"; and he retained Prometheus Financial Advisory to render a Fairness Opinion to Cambridge's board of directors, which encompassed "[e]xtensive and daily discussions with Ability's management team regarding Ability's business, products, operations, financial performance, internal controls and growth plans[.]"[57]  His status as an acquirer with insider access to and deep knowledge of the Company's financial results, financial performance, financial infrastructure, internal systems, financial projections, and financial controls, along with his background in finance and business, placed him in a unique position to know – or gave him access to information demonstrating – that the statements described above were false and misleading at the time they were made, and he therefore intentionally or recklessly made those statements or caused those statements to be made.

131.    In particular, Defendants' duty to monitor information regarding the Company's financials was triggered at a minimum when the SEC began asking questions about Ability's revenue practices.  In its second amended Form S-4 registration statement, Defendants caused to be stated that "certain revenues that were expected to be received by Ability in the second half of 2015 will likely be delayed and received in early 2016," and that Defendants had advised the Company's fairness opinion provider of this fact.[58]  On November 24, 2015, the SEC sent a letter to Defendants asking them to (a) "explain, and quantify where necessary, why the likely delay in certain revenues to be received by Ability does not impact [the] fairness conclusion"

---

[57] Proxy Statement, at 77-78.

[58] Cambridge Holdco Corp., Amendment No. 2 to Registration Statement Under the Securities Act of 1933 on Form S-4, November 17, 2015, at 17.

60

rendered; (b) consider the impact of shifting these revenues from the second half of 2015 to the first half of 2016 on Ability's September 30, 2015 results of operations narrative; and (c) explain the development or tell the SEC "why you believe further discussion is not warranted under . . . Regulation S-K."[59]  Despite this, Defendants continued to make representations to the SEC and the investing public regarding Ability's financial condition and knew or consciously disregarded the risk that certain revenues were not being recognized in the right periods, that expenses were not being properly matched with revenues, that GAAP was not being followed, and that Ability's internal controls over financial reporting were insufficient.

132.    Defendants intentionally made or were reckless in making the false and misleading statements described above.  They knew facts or had access to information showing that their public statements regarding Ability's financials, accounting, and internal controls were false, materially misleading, and unreliable, and/or they failed to check information they had a duty to monitor.  Their actions were in part a product of their desperation to complete the Business Combination: Cambridge was working on an accelerated timeline and desperate to close a deal before the end of 2015 so that Gordon could ensure that his investment in Cambridge would not become a permanent loss of almost $1 million; and Hurgin's opportunity to make a substantial sum of money – at least half of an $11,000,000 pay-out in the form of a one-time dividend – necessitated working within Gordon's accelerated timeline.  This pressure helped create the environment in which Defendants' intentional misconduct or recklessness manifested.

133.    Each Defendant made these false and misleading statements because they were engaged in a desperate scheme to convince Cambridge shareholders to vote in favor of the

---

[59] Letter from Securities and Exchange Commission to Benjamin Gordon, November 24, 2015, at ¶ 1.

Business Combination with Ability, Ltd.  Defendant Gordon was desperate for his company, Cambridge, to close a business combination – *any* business combination – before the end of 2015.  Failing to do so would result in substantial personal financial losses to him of approximately $1,000,000, comprising cash that he had loaned Cambridge and the value of the Cambridge shares that he owned that would become worthless absent a deal.  Closing a business combination would avoid this substantial personal loss: his loans to Cambridge would be paid back and he would instead be enriched with millions of highly profitable shares in Ability.  Given that his two previous possible Cambridge mergers had fallen apart, Gordon was running up against the clock to consummate a deal by the end of 2015, so closing a deal with Ability, Ltd. – a company well outside of Cambridge's stated industry focus and expertise – was Gordon's only viable way to ensure that his losses did not become permanent and instead become a new source of significant wealth.  Indeed, after the Business Combination was consummated, Gordon owned or controlled approximately 1,700,000 shares, or about 6.5% of the company.[60]

134.   Hurgin was similarly desperate to close the deal because of its financial incentives.  The merger agreement stated that Ability, Ltd. would pay – immediately before consummation of the combination – a massive one-time dividend of $11,000,000 to its only two shareholders, Hurgin and Aurovsky.  This detail was buried in a single sentence in Ability and Cambridge's SEC filings, but the SEC found it so unusual that it specifically ordered Defendants to disclose that detail to investors up-front in the December 2, 2015 proxy statement and prospectus.[61]  In addition to this one-time infusion of cash, the Business Combination would

---

[60] Gordon owns 200,000 shares personally and the remainder is owned by a trust established for the benefit of his family.

[61] U.S. Securities and Exchange Commission Letter from Larry Spirgel to Benjamin Gordon, at ¶ 9 (Oct. 14, 2015) (filed with the SEC).

shower Hurgin with millions of shares in a publicly traded company: at the deal closing, he owned 8,100,000 shares of Ability, or 31.5% of the Company, and he is eligible to obtain millions more if Ability hits certain net income targets.   All of this is in addition to the $18,150,000 in cash that Hurgin and Aurovsky received from Cambridge in exchange for their shares in Ability, Ltd., which represented yet another concrete and personal benefit gained from making these false and misleading statements.

135.   Defendants Gordon and Hurgin made the false and misleading statements described above for an added purpose: to benefit in a concrete and personal way by boosting the price of Ability's publicly-traded shares, thereby increasing their wealth.   Ability is unlike other companies with respect to executive compensation because the number of Ability shares owned by Gordon and Hurgin is atypically – indeed, startlingly – high.   Together, these two Defendants (including Gordon's family trust) own 38% of the Company's shares, a number that is unusual in the industry.   By comparison, Ability's self-described publicly-traded competitor, Verint Systems Inc., has a shareholder structure where all ten of its executive officers and directors *as a group* own less than 2% of the company's shares.

136.   Finally, the extent of the fraud demonstrates that Defendants acted intentionally and/or recklessly: (1) Ability disclosed on May 2, 2016 that it had authorized an internal investigation to be overseen by its audit committee into the facts and circumstances giving rise to the May 2016 restatement; (2) on February 15, 2017, the Company announced that the SEC had opened an investigation into Ability's transaction with Cambridge and the May 2016 accounting restatement; (3) Benjamin Gordon, Mitchell Gordon, and Derek Zissman – all members of the Ability Board of Directors and specifically members of the audit committee – resigned, leaving the Company in December 2016, and their replacements – Amos Malka, Amnon Dick, and

Shalom Singer – joined the Ability Board of Directors, but abruptly resigned only a few months later, on April 9, 2017, along with two more directors, Meir Moshe and Efraim Halevy; (4) on May 16, 2017, the Company announced that its auditor has substantial doubt about its ability to continue as a going concern; and (5) on June 8, 2017, the Company announced that it received notification on June 6 that it was not in compliance with the minimum bid price requirement set forth in NASDAQ's rules, and thus could be delisted.

### F.   Defendants' conduct caused Lead Plaintiffs' losses.

137.   The market for Ability common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and misleading statements stated above, Ability common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and other members of the Class purchased Ability common stock relying upon the integrity of the market price of Ability common stock and market information regarding Ability, and have been damaged thereby.

138.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Ability's business.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Ability and its business, causing its common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing Ability common stock at artificially inflated prices, thus causing the damages complained of herein.

139.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Ability common stock and operated as a fraud or deceit on Class Period purchasers of Ability common stock by failing to disclose and misrepresenting the adverse facts detailed herein.    As Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Ability common stock declined significantly as the prior artificial inflation came out of the price of Ability common stock.

140.    As a result of their purchases of Ability common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.    Defendants' false and misleading statements had their intended effect and caused Ability common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $10.16 per share on January 4, 2016.

141.    By making false statements and concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Ability's business.    When the truth about Ability was revealed to the market, the price of its common stock fell significantly.    This decline removed the inflation from the price of Ability common stock, causing real economic loss to investors who had purchased Ability common stock during the Class Period.

142.    The decline in the price of Ability common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.    The timing and magnitude of the price decline in Ability common stock negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

65

143.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to persuade Cambridge shareholders to approve the Business Combination and thereby artificially inflate and maintain the price of Ability common stock, and the subsequent significant decline in the price and value of Ability common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**G.    Lead Plaintiffs are entitled to a presumption of reliance.**

144.    Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Ability common stock was an efficient market for the following reasons, among others:

a.    Ability common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, electronic stock market;

b.    Ability's stock had an average weekly trading volume that exceeded 2%;

c.    Ability's stock had a causal relationship between its share price and publicly available information;

d.    As a regulated issuer, Ability filed periodic public reports with the SEC and the NASDAQ;

e.    Ability regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

f.      Ability was followed by securities analysts employed by major brokerage firms, including FBR & Company, Dane Capital Management, Gruber and McBaine Capital Management, and Quintessential Capital Management, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.

145.    In the alternative, Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are in part predicated upon the omission of material facts that Defendants had a duty to disclose, namely, that Ability's internal financial controls suffered from multiple material weaknesses rendering its financials false, misleading, and unreliable, and that its financials needed to be restated for fiscal years 2014 and 2013, and for the periods ending June 30, 2015 and September 30, 2015; that it had committed a possible violation of Section 402 of the Sarbanes-Oxley Act; and that its purportedly transformative technology, ULIN, was not developed or owned by Ability but rather was designed and owned by an unrelated third party.

146.    As a result of the foregoing, the market for Ability common stock promptly digested current information regarding Ability from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers of Ability common stock during the Class Period suffered similar injury through their purchase of Ability common stock at artificially inflated prices and a presumption of reliance applies.

**H.      Claims for relief under the Exchange Act.**

### *Count Three*

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants Ability, Hurgin, Gordon, and Levin**

147.    Lead Plaintiffs repeat and re-allege the allegations stated in ¶¶ 1-30 and 85-146 as if fully set forth herein.

148.    During the Class Period, Defendants disseminated the materially false and misleading statements specified above.  Defendants knew or deliberately disregarded that the statements were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

149.    Defendants (a) employed devices, schemes, and artifices to defraud, (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Ability common stock during the Class Period.

150.    Lead Plaintiffs and the Class have suffered damages.  By relying on the integrity of the market, they paid artificially inflated prices for Ability common stock.  Lead Plaintiffs and the Class would not have purchased Ability common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

151.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Ability common stock during the Class Period.

### Count Four

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Hurgin, Gordon, and Levin

152.    Lead Plaintiffs repeat and re-allege the allegations stated in ¶¶ 1-30 and 85-146 as if fully set forth herein.

153.    Defendants Hurgin, Gordon, and Levin committed a primary violation of Section 10(b) and Rule 10b-5.  They intentionally or recklessly made or caused to be made certain false and materially misleading statements regarding Ability's financials, accounting, internal controls, and development and ownership of ULIN.

154.    Defendants, by virtue of their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Ability within the meaning of Section 20(a) of the Exchange Act.  Defendants had the power, influence, and knowledge – and exercised the same – to cause Ability to engage in the acts described herein.

155.    Defendants at all relevant times participated in the operation and management of Ability, and conducted and participated, directly and indirectly, in the conduct of Ability's business affairs.  Defendants were under a duty to disseminate accurate and truthful information with respect to Ability's financial condition.  Because of their positions of control and authority as officers and directors of Ability, Defendants were able to, and did, control the contents of the investor presentations, SEC filings, and press releases, which contained materially untrue and misleading statements.

156.    Defendants' control, ownership, and positions made them privy to and provided them with knowledge of the material facts concealed from Lead Plaintiffs and members of the Class.

157.    Defendants Hurgin, Gordon, and Levin acted as controlling persons of Ability within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Ability, and their ownership of Ability stock, these Defendants had

the power, authority to cause Ability to engage in the wrongful conduct complained of herein. They were culpable participants in Ability's fraud.

158.    By reason of such conduct, these Defendants are liable to Lead Plaintiffs and the Class pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

Lead Plaintiffs pray for relief and judgment as follows:

a.    a determination that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and Lead Plaintiffs' counsel as Class Counsel;

b.    an award of compensatory damages in favor of Lead Plaintiffs and the Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    an award for Lead Plaintiffs and the Class for the reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    an order granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiffs demand a trial by jury.

2179127.11

Date:   June 15, 2017

Respectfully submitted,

*/ s / Daniel S. Sommers*

Lesley F. Portnoy (LP-1941)
GLANCY PRONGAY & MURRAY LLP
122 East 42nd Street │ Suite 2920
New York, New York 10168
Tel.: (212) 682-5340
Fax: (212) 884-0988
lportnoy@glancylaw.com

Robert V. Prongay
Kara M. Wolke
Elaine Chang
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
rprongay@glancylaw.com
kwolke@glancylaw.com
echang@glancylaw.com

*Attorneys for Co-Lead Plaintiff Theodore
Zwicker and Court-Appointed Co-Lead
Counsel for the Class*

Daniel S. Sommers
S. Douglas Bunch (SB-3028)
Elizabeth A. Aniskevich
Adam H. Farra
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W. │ Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
eaniskevich@cohenmilstein.com
afarra@cohenmilstein.com

*Attorneys for Co-Lead Plaintiff Ametren L.P.
and Court-Appointed Co-Lead Counsel for the
Class*

Jacob Sabo
LAW OFFICE OF JACOB SABO
#3 Daniel Frisch St. / 24th Floor
Tel-Aviv, Israel 64731
Tel.:  03-7161555
Fax:  03-7161556

*Additional Attorney for Co-Lead Plaintiff
Ametren L.P.*

71